[Civ. No. 16811.   First Dist., Div. One.   Apr. 25, 1956.]

THE PEOPLE, ex rel. CARL PENNINGTON et al., Respondents, v. CITY OF RICHMOND et al., Appellants.

Thomas M. Carlson, City Attorney, Dana Murdock and Robert Eshleman, for Appellants.

Edmund G. Brown, Attorney General, Charles A. Barrett and Eugene B. Jacobs, Deputy Attorneys General, Robert T. Anderson, James P. O'Drain and Robert W. Pelletreau for Respondents.

WOOD (Fred B.), J.—The city of Richmond has appealed from a judgment that the purported annexation of 10.3 square miles of territory under authority of the Annexation of Uninhabited Territory Act of 1939 (Gov. Code, §§ 35300-35326 and §§ 35000-35011) was null and void.[1]

The judgment is based upon findings that at the time of the filing of the petition for annexation (December 22, 1953) 18 registered voters resided in the territory proposed for annexation. This, exceeding the "less than twelve" specified in section 35303 of the Government Code, characterized the territory as not uninhabited and rendered it unavailable for annexation under the act cited. Richmond challenges this finding, claims there were only 11 resident registered voters in the territory.

The seven challenged resident voters were Edward, Joseph and Mary Aguiar, Edward and Jeanette Campbell, and Chester and Martha Wimberley. We will consider the Aguiars and the Campbells first. They are in a category different from that of the Wimberleys.

The Aguiars resided and were registered as voters residing upon a certain lot that was 100 feet wide and about 500

---

[1] Two appeals were taken: one from the judgment as originally rendered; the other, after modification of the findings in certain respects pursuant to section 662, Code of Civil Procedure.

The appeal from the judgment first rendered will be dismissed.

feet deep. Their dwelling was near the front of the lot. The rear fourth of this lot was included in the territory proposed for annexation.

The same situation obtained as to the Campbells except that their lot was about 560 feet deep.

Each of these lots slopes downward from an elevation of 125 feet at the front to 50 feet at the rear. The last 30 feet of the drop occurs below the annexation boundary line (hence, within the annexation territory) and was quite thickly covered with willows, brush and other wild plant growth. The rear end of each lot lay along the middle of the channel of a creek. The annexation boundary line was more than 300 feet distant from either dwelling house. The portion of each lot thus included within the annexation territory fell wholly within the area of a freeway then planned by the State Highway Commission. The state had prior to the filing of the petition for annexation commenced negotiations with landowners for acquisition of title to or easements through these and other lands for the freeway but did not acquire title from the Aguiars and the Campbells until deeds were executed some time after the filing of the annexation petition.

Concerning the use made of these lots Mrs. Aguiar testified that the Aguiar property was one undivided parcel of property upon which they had resided continuously since January, 1950; that their whole property was used as their residence; that her husband carried on his contracting business from that location; and that material and equipment used in conjunction with the business were stored on all of the property including the portion that lay within the annexation territory. Mrs. Campbell testified that the Campbell property was one undivided parcel of property upon which they had continuously resided since February, 1950; that they intended to use the entire parcel for their home uses; that they have used all of it in the back and intended to make an orchard out of it; and that her husband used the portion of the property included in the annexation territory all the time for something.

This evidence supports the trial court's findings that the premises upon which the Campbells resided "consisted of a single undivided parcel of land; that prior to, on and after December 22, 1953, all of said premises were used by the said Campbells for residential purposes; . . . that the boundary line of the said territory proposed to be annexed to Richmond was drawn across said parcel in such manner as to include

approximately one-fourth thereof within the territory proposed to be annexed; that the dwelling thereon was outside the territory proposed to be annexed; that the said annexation boundary line was drawn in such manner for the purpose of evading and circumventing the requirements of the Annexation Act of 1913; that on December 22, 1953, the said two (2) Campbells were registered voters residing within the said territory proposed to be annexed." The evidence also supports substantially identical findings as to the Aguiars and the premises upon which they resided. Thus, the Campbells brought the number of resident registered voters up to 13; the Aguiars, up to 16. Twelve would characterize the annexation territory as not uninhabited and thus render unavailable the statute under which this proceeding was taken. The legal conclusion would inevitably follow that the entire proceeding was without legal sanction and therefore of no effect.

Invoking the principle that the expediency of the annexation of a particular area is a political, not a judicial question (*Johnson* v. *City of San Pablo*, 132 Cal.App.2d 447, 457 [283 P.2d 57], and cases there cited), Richmond claims it had the right to include portions and was not required to include the whole of the Aguiar and the Campbell lots.

That, it would appear, is true, but the exercise of such a right does not necessarily render uninhabited the portion taken. To annex land is one thing; to strip it of its quality of being inhabited is quite another. The state of being inhabited is an attribute, a characteristic, a quality every bit as real as the state of being owned, possessed or farmed. Bisecting a lot by means of an annexation boundary line does not extinguish any of these qualities of the land. Each of the resultant portions continues an integral part of the whole in respect to ownership, possession, occupancy, use, and residency. The power to fix the course of the boundary line does not include the power to strip the land of any of these qualities nor the power to interfere with or to cut down any of the rights or privileges of the owner or of the occupier of the land.

Richmond suggests that the portions of these lots below the annexation line were not inhabited because of the wild, uncultivated state they were in. That was not the view of Mrs. Aguiar or of Mrs. Campbell. Moreover, its wild and uncultivated state would be an attractive and desirable quality to many an owner or tenant for a portion of his residency. Besides, the trier of the facts has drawn the inference and made the finding that the whole of each of these lots was

inhabited. In the state of the evidence no reviewing court may disturb that finding.[2]

This concept of "inhabited" finds support in the case law which developed prior to the legislative definition of "uninhabited" which was first made in 1945, and, as modified in 1947, now appears in section 35303 of the Government Code.

In an early case our Supreme Court sustained a finding of the trial court to the effect that certain territory "taken as a whole, may fairly be said to be inhabited" notwithstanding "the presence of several uninhabited tracts or parcels, each exceeding five acres in area." (*People* v. *Town of Ontario,* 148 Cal. 625, 641 [84 P. 205]; followed and applied in *Rogers* v. *Board of Directors of Pasadena,* 218 Cal. 221, 223 [22 P.2d 509], and in *People* v. *City of Whittier,* 133 Cal.App. 316, 320, 321 [24 P.2d 219].)

In the course of ascertaining and determining whether certain parcels (some inhabited and some not) constituted a single tract, the court in *People* v. *City of Lemoore,* 37 Cal. App. 79, 81 [174 P. 93], observed: "There would be no difference in principle if the tract were composed of ten acres or of one acre. If A owns a farm of 308½ acres composed of one tract and B one of ten acres and each resides upon his land, it would be just as inapt to say that any part of A's land is uninhabited as to so affirm of B's land. The fact of occupancy is not limited, manifestly, to the space occupied by the building or buildings, but extends to every portion of the single tract of which that space is an undivided

---

[2]In this connection we note that Richmond predicates error upon the trial court's rejection of its offer to prove by the testimony of its city clerk that on January 24, 1954, Mr. Aguiar, Senior, made a statement to the effect that he never intended to use the lower portion of the Aguiar property for residence purposes and certainly never had such an intention after he learned the state wanted to acquire it for a freeway. An objection that this would be hearsay was sustained.

Plaintiff claims the evidence was admissible upon the asserted ground that Mrs. Aguiar testified concerning her and Mr. Aguiar's use of the property and their intentions in respect thereto.

Mrs. Aguiar merely described the uses made of the property. We have examined all of her testimony and find in it no statement as to the intentions of the Aguiars in relation to the use of this property. In view of this fact and of the facts that none of the Aguiars has been a party to this proceeding and Mr. Aguiar was not a witness, it would appear that the objection was properly sustained.

Even if the questioned ruling were erroneous it could not be prejudicial to Richmond's case because it would leave unaffected the residential status of the Campbells and their property, resulting in at least 13 resident registered voters in the annexation territory, thus exceeding the "less than twelve" specified in section 35303 of the Government Code.

part. It may be difficult to formulate a description that can be applied with accuracy to every situation,[3] but to say that any portion of a single and separate tract of land is uninhabited when people actually reside within the boundaries of that tract of land involves a contradiction in terms.''

This was the judicially developed concept of ''inhabited,'' presumably known to the Legislature when in 1945 the Annexation of Uninhabited Territory Act was amended to define territory as uninhabited if ''less than three qualified electors reside'' within it at the time of the filing of the petition. (Stats. 1945, ch. 506, p. 1006.) This narrowed to ''qualified electors'' the class of resident persons to be considered; quite natural and entirely logical, there being no point in counting a person who because of age or alienage cannot cast a vote for or against annexation.

The 1947 amendment increased the number from three to twelve and substituted ''registered voter'' for ''qualified elector.'' (Stats. 1947, ch. 107, p. 633; now Gov. Code, § 35303.) This change made for greater certainty and ease of ascertainment because the number of resident registered voters can be determined readily from the register of voters kept by the county clerk or by the registrar of voters of the county.[4]

We conclude that the trial judge had the correct concept of the legal significance of the expression ''registered voters reside'' when he made the questioned findings.

At this point Richmond interposes the argument that none of the Aguiars or of the Campbells could vote at an annexation election if the very territory here involved were proposed for annexation under the Annexation Act of 1913. (Gov. Code, §§ 35100-35158 and 35000-35011.) That, it is said, renders purposeless and absurd any line of reasoning which supports the view that the northerly portions of their lots were inhabited.

For present purposes we may assume that to vote for or against annexation one would have to be a registered voter residing in the territory to be annexed. Thus, in the

[3]By this statement, we infer that the court intended to qualify what otherwise might appear to be too rigid a formula and thus allow the courts in each case to determine whether industrial or other nonresidential use of a distinct portion of a lot or of a ranch pares down the area thereof that properly may be deemed residential.

[4]For the distinction between ''qualified elector'' and ''registered voter,'' see *Minges* v. *Board of Trustees*, 27 Cal.App. 15, 18 [148 P. 816].

Annexation Act of 1913 we find these expressions: "voters within the area" (Gov. Code, § 35114); "defeated by the electors of the territory" proposed to be annexed (§ 35115); petition signed by "qualified electors residing within the territory, as shown by the county registration of voters" and "submit the question of annexation to the electors residing in the territory" (§ 35116); the city legislative body "shall call a special election . . . and submit to the electors residing in the territory the question . . ." (§ 35122). These expressions coincide quite accurately with the expression used in the Annexation of Uninhabited Territory Act of 1939, "registered voters reside within" (§ 35303).

But the drawing of an annexation boundary line across a man's lot, taking in a portion where he does not sleep or eat, does not necessarily deprive him of the right to vote on the question of annexation under the 1913 act. He is still registered and the portion is still inhabited by him. He still resides in that portion and, consequently, in the territory proposed for annexation. This is a fact which it would seem reasonable for the city council to take into consideration when discharging its duty of establishing and designating the voting precincts as provided in section 35126. Should not the council so draw the precinct lines as to include the Aguiars and the Campbells? The statute would seem to make that possible. It does not incorporate the provisions of the election laws without qualification. Instead, it says they are applicable "as nearly as possible" and "except as otherwise provided" (§ 35130).

But even if there were some imperfection in the Annexation Act of 1913 which would stand in the way of the Aguiars and the Campbells casting their votes if the present proceeding had been brought thereunder, that would not make the territory here involved "uninhabited" within the meaning of the 1939 act. The 1939 act merely imposes as a test that not more than eleven registered voters "reside" in the territory. It provides for no election, says nothing about voting. Appellant argues that this analysis is illogical because, assertedly, it creates a "no-man's-land" that could not be annexed under either of these two statutes. Such a situation, if it should occur, would not be a creature of the statutes. It would be the creature of the city council that drew the proposed annexation boundary line in such a fashion.

We should, perhaps, say a word about the city's *reductio ad absurdum* argument that the concept of "residence"

which the trial court applied has no limit; that, logically extended, it would apply to a holding of 1,000 acres or more if the occupant is a registered voter and has a dwelling house in one corner of it. There well may be limits to the concept of "residency." If a man has 50,000 acres extending several miles across several watersheds with his dwelling house in one corner of it, some limit doubtless could be found.

The nature of the use of the various parts, if there be parts, of a ranch, an estate, or a town lot, would be a significant factor to consider. Is it residential in character or is it nonresidential, such as industrial, commercial or agricultural? If it is any of the latter, does it pervade the part so used in such a manner and to such an extent as to make it unreasonable to view it also as residential? Conceivably, a person might have a home orchard in his backyard or might conduct on the premises a small business of such a character and in such a manner that it would still be within reason to say that he nevertheless resides upon the entire lot. Then, too, in some cases the existence of a permanent barrier, natural or artificial, would enter into the picture for determination; e. g., a stream, a mountain ridge, a street, or a railroad. There well may be other factors, upon occasion, factors which presently do not occur to us.

The attorney general has been very helpful to us in the analysis of this and related problems. He has suggested a formula for our consideration and promulgation for his guidance and the guidance of city officials and other persons interested. We welcome the suggestion but doubt the wisdom of our undertaking, at least at this time and in this case, to formulate a rule on this subject. It is essentially a factual question, to be specially determined in each case after weighing all of the facets of the relevant evidence produced. Moreover, ours is a relatively simple case, one that does not present any very close questions. Each lot involved is only 100 feet wide and 500 to 560 feet long, and the trial court has found, upon substantial evidence, that each lot is a "single undivided parcel" and that "all" of it was used (on the critical date) "for residential purposes." Hence, we deem the present an inopportune occasion for the formulation of a rule that might serve as a test in determining "residency" under the statute.

The Wimberleys, as we have indicated, are not in the same category as the Campbells and the Aguiars. They moved from Richmond into the annexation territory about three weeks

before the filing of the annexation petition but did not transfer their registration from their former residence to the new until 15 or 16 days after the filing. Literally, they were "registered voters" (registered as residents of Richmond) and they did "reside within" the territory (see § 35303) but we deem that not enough. We see no escape from the conclusion that the statute requires one to be registered as of the place where he resides on the crucial day, the day of the filing of the petition. (Probably, also, he should be entitled to vote if an election were held in that area on that date.) To recognize registration in any other precinct would sanction registration in any county in the state and introduce an element of great uncertainty into the administration of the statute.

Richmond claims that in the absence of fraud the findings of the city council (including its finding that the territory was uninhabited) were final; that there was no proof of fraud; hence, it was incompetent for the trial court to make findings contrary to those made by the city council.

This contention necessarily rests upon the assumption that the Legislature by some statute has conferred upon the city power to make such a determination, for the power of annexation is not a power to "make and enforce . . . local, police, sanitary . . . [or] other regulations" conferred by section 11 of article XI of the Constitution, nor is it a power to make and enforce laws and regulations in respect to "municipal affairs" which Richmond as a chartered city has under sections 6 and 8 of the same article. (See cases collected in 18 Cal. Jur. 775-776, Municipal Corporations, § 87, and 736-737, § 45.) The city has not directed our attention to any specific statutory provision on this subject. Section 35303 of the Government Code defines "uninhabited" but is silent as to who determines the inhabited or uninhabited character of land proposed for annexation. Section 35313 may by inference confer such a power as an incident to the exercise of the power it gives the local legislative body to "hear and pass upon all protests." Even if so, such a conference of power falls considerably short of the exclusive character of the similar function which was involved in *Shepherd* v. *Board of Supervisors,* 137 Cal.App. 421 [30 P.2d 578]. There the statute expressly declared that the board "shall hear the . . . protestations, and unless the remonstrances are filed by the owners of more than one-half of the land sought to be annexed, *the decision of said board . . .* upon said protestations *shall be final and*

*conclusive.''* (Stats. 1899, p. 37, § 1; as amended by Stats. 1929, pp. 800, 801.) We are confronted with nothing like that in the statute here involved.

■ Even if the city had power to decide whether this territory was uninhabited, we must not forget this presents a jurisdictional question, upon which depends the very power of the city to act. A discussion of the judicial nature of an inquiry concerning the existence of facts upon which the jurisdiction, the very capacity of an agency to act depends, will be found in 4 Cal.Jur. 1110-1113, section 71; in 10 Cal.Jur.2d 163-165, section 85; in 5 A.L.R.2d 675; and in cases cited in each.

■ Finally, the city (as a special defense pleaded in its answer) presented these very questions[5] for decision by the court de novo, not by way of review of a decision by the city. These allegations, of course, were and are "deemed controverted by the opposite party" (Code Civ. Proc., § 462) and thus became justiciable issues in the case, quo warranto being a "civil action" (see Code Civ. Proc., §§ 802-811, situate in part II of the code) and as such is governed by all of the pertinent procedural and practice provisions of part II of the code, including those expressed in sections 421, 422, 437 and 462.

[5]This defense read in part as follows:

"That three registered voters, namely, E. J. Aguiar, J. S. Aguiar and M. Aguiar, reside on acreage commonly known and designated as 3401 San Pablo Dam Road and two registered voters, namely Edward Campbell and Jeanette M. Campbell reside on acreage commonly known and designated as 3411 San Pablo Dam Road. That a small undeveloped portion of the rear acreage belonging to the Aguiars and the Campbells was included in the territory annexed to the City of Richmond pursuant to Ordinance No. 1423 as particularly disclosed on the plat attached hereto, designated Exhibit 'D' and by this reference incorporated herein and made a part hereof and that the dwellings in which the Aguiars and the Campbells live and actually reside are situated approximately 300 feet easterly from and outside the annexed areas, being and remaining in the unincorporated portions of the County of Contra Costa. That the portion of the acreage belonging to the Aguiars and Campbells, as aforesaid, which was annexed to Richmond was situated entirely within the area which has recently been acquired by the State of California for a proposed freeway; that negotiations for acquisitions of said acreage by the State of California from the Aguiars and Campbells, as aforesaid, was commenced prior to December 22, 1953, the date the annexation petition was filed with the City Council of Richmond and that as to said property neither the Aguiars nor the Campbells after commencement of said negotiations for sale of their respective property to the State of California, as aforesaid, intended to use or make use of any thereof for residence or other purposes.''

Exhibit "D,'' mentioned in the pleadings, depicted the Aguiar and Campbell lots and showed in color the portions thereof which lay in the territory proposed for annexation.

The city then proceeded to and did try these issues on that theory, clear through to the end of the trial, including the arguments of counsel after the taking of the evidence. The parties put in their evidence on these issues just as in any other trial before a court of first instance, just as if there had been no determination by the city or by any other tribunal subordinate to the superior court. It would be strange indeed if a party could thus tender material issues to the superior court, present evidence to that court on those issues and suffer, indeed induce, the opposite party to do likewise, and then, confronted with an adverse decision, claim upon appeal that this was all a mistake, that the entire trial in the superior court should have been conducted as if a mere review of an earlier trial and determination by the city council, a mere agent of the very party defendant who thus tendered these issues to and tried them de novo before the superior court. No one questions the competency of the city thus to ignore the decision of its own agent and relitigate these issues before the superior court, a court of unquestionably competent jurisdiction. (As illustrations of various types of situations in which the submission to the courts of such or similar factual issues has received judicial sanction, the following may be cited: *Capuchino Land Co.* v. *Board of Trustees*, 34 Cal.App. 239 [167 P. 178]; *People* v. *City of Lemoore, supra*, 37 Cal.App. 79, 86; *People* v. *City of Monterey Park*, 40 Cal.App. 715, 722-723 [181 P. 825]; *English* v. *City of Long Beach*, 114 Cal.App.2d 311, 315-317 [250 P.2d 298].

The doctrine which requires an appellant to stay with the theory upon which he tried the case, clearly applies here.[6]

[6]The city puts some reliance upon the fact that in the findings and conclusions first filed there was a conclusion of law that "any defense based upon the finality and conclusiveness of the Richmond City Council's determination that said territory was uninhabited was waived by defendants; that even if there had been no such waiver, such determination by said City Council was not conclusive upon this court in this action."

In the findings, later filed, this conclusion was cut down to read:

"The determination of the Richmond City Council that said territory was uninhabited is not conclusive upon this court in this action."

That, of course, was not a determination by the trial court that the city had not made such a waiver.

We do not know how the question of such a "waiver" came to the attention of the trial court. Nothing in the record upon this appeal that has come to our attention affords any information on that question.

We are not particularly concerned with the question whether there was a technical "waiver" or not. It is a simple case of a party tendering certain issues to and trying those issues before the superior court de novo, just as if they had for the first time come before a tribunal for determination.

(See 3 Witkin, Cal.Proc. 2264-2267.) Quite recently, we made similar disposition of a like contention by the city of San Pablo, involving annexation proceedings by that city and the City of Richmond. (See *Johnson* v. *City of San Pablo, supra,* 132 Cal.App.2d 447, footnote on page 454.)

It necessarily follows that the defendant city was without jurisdiction to proceed under the Annexation of Uninhabited Territory Act and that the judgment must be affirmed.

It, therefore, becomes unnecessary to decide whether the conclusion of law that the boundaries were drawn in such a manner as to exclude the Aguiar and Campbell dwelling houses "for the purpose of evading and circumventing the requirements of the Annexation Act of 1913" finds full support in the evidence and the findings of fact. (Concerning the power of the courts to determine factual issues when fraud is involved, see *People* v. *Town of Corte Madera,* 115 Cal.App.2d 32, 44-45 [251 P.2d 988]; *City of Anaheim* v. *City of Fullerton,* 102 Cal.App.2d 395, 401-404 [227 P.2d 494].) With or without such an intent, the city had no jurisdiction to proceed under the Annexation of Uninhabited Territory Act.

In view of our holding in respect to the Wimberleys, paragraph VII of the findings of fact last filed (clk's trans., p. 76, l. 4 to 16) should be and it is hereby amended to read as follows:

"That on December 22, 1953, Chester C. Wimberley and Martha L. Wimberley resided on premises wholly within the territory proposed to be annexed to the City of Richmond, having moved to said premises on December 1, 1953, from their former residence at 434 South 2nd Street, Richmond, California; that on December 22, 1953, the two (2) Wimberleys were registered voters at the said 2nd Street address; that the said 2nd Street residence was not within the territory proposed to be annexed; that the said Wimberleys re-registered at their residence in the territory proposed to be annexed on January 6 and January 7, 1954, respectively; that on December 22, 1953, the said two (2) Wimberleys were not registered voters residing within the said territory proposed to be annexed."

In view of the foregoing amendment paragraph VIII of said findings of fact (clk's trans., p. 76, l. 18 to 23) should be and it is hereby amended to read as follows:

"That on December 22, 1953, there were eleven (11) registered voters residing within the said territory proposed to be

annexed to Richmond in addition to the three (3) Aguiars, and the two (2) Campbells; that on said December 22, 1953, there were sixteen (16) registered voters residing within the said territory proposed to be annexed to the City of Richmond.''

There is one feature of the judgment which requires modification. After declaring this annexation proceeding void, the judgment declares that the territory involved ''is not and never has been legally annexed . . . and is not and never has been a part'' of the city and ''was and is unincorporated territory.'' That is too broad in its sweep. It impinges upon any other annexation proceeding that may have been initiated concerning this territory or some portion thereof. It should be confined to the proceeding which is the subject of this action.

Accordingly, the two paragraphs of the judgment last filed which begin with the words ''It is further ordered, adjudged and decreed that said territory is not and never has been'' and end with the words ''shall not exercise any jurisdiction or dominion therein or thereover'' (clk's trans., p. 82, l. 1 to 8) should be and they are hereby amended to read as follows:

''It is further ordered, adjudged and decreed that the proceedings hereby voided and annulled did not cause said territory to be legally annexed nor to become a part of the City of Richmond.

''It is further ordered, adjudged and decreed that the City of Richmond shall not, based upon the annexation proceedings hereby voided and annulled, exercise (1) the franchise of municipal government in or over said territory or (2) any jurisdiction or dominion therein or thereover.''

As thus modified the judgment last filed (entered March 29, 1955), is affirmed. The appeal from the judgment first filed (dated February 1 and entered February 2, 1955) is dismissed. The respondents will recover their costs upon this appeal.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied May 25, 1956, and appellants' petition for a hearing by the Supreme Court was denied June 20, 1956. Spence, J., was of the opinion that the petition should be granted.