[Civ. No. 19919. First Dist., Div. One. Nov. 19, 1962.]

SHELLEY R. COTHRAN, Individually and as Executor, etc., Plaintiff and Respondent, v. THE TOWN COUNCIL OF LOS GATOS, Defendant and Appellant.

648

650

J. Rainey Hancock for Defendant and Appellant.

Everett P. Rowe for Plaintiff and Respondent.

SULLIVAN, J.—This is an appeal by The Town Council of Los Gatos from a judgment granting respondent's petition for a writ of mandate and commanding appellant to terminate certain annexation proceedings initiated pursuant to the Annexation of Uninhabited Territory Act of 1939. (Gov. Code, §§ 35300-35326.)

The basis of the above judgment was a finding that on June 6, 1960, the day such proceedings were initiated by appellant (see Gov. Code, § 35310) there were 12 registered voters residing within the territory proposed to be annexed. Since under the applicable statute as it then read, "territory shall be deemed uninhabited if *less* than twelve registered voters reside within it at the time of . . . the institution of proceedings on motion of the city legislative body" (Gov. Code, § 35303; emphasis added), the court concluded that the territory in question was not uninhabited, that appellant in initiating the proceedings exceeded its jurisdiction and that the writ should issue to terminate them.[1]

At the trial the parties stipulated and the court found that

[1]Mandamus is a proper remedy to compel termination of proceedings under the Annexation of Uninhabited Territory Act of 1939 prior to the time when *quo warranto* becomes available. (*County of San Mateo* v. *City Council, Palo Alto* (1959) 168 Cal.App.2d 220, 221 [335 P.2d 1013]; *American Distilling Co.* v. *City Council, Sausalito* (1950) 34 Cal.2d 660, 666-667 [212 P.2d 704, 18 A.L.R.2d 1247]; *City of Campbell* v. *Mosk* (1961) 197 Cal.App.2d 640, 645 [17 Cal.Rptr. 584].)

eight specified persons were registered voters residing within the territory on June 6, 1960. In addition, the court found and concluded that Oliver F. Hitchcock and Marie Hitchcock, husband and wife, and Joseph A. Rogers and Linda L. Rogers, husband and wife, were also registered voters residing there on said date, thereby bringing the total number of such persons to 12. It is around the last four persons that the present controversy revolves and it is against the findings and conclusions pertaining to them, that appellant directs its attack.

We therefore proceed to determine, separately as to each of the above married couples, whether the court's determination that they were registered voters residing within the territory on the crucial date is sustained by the evidence and the law.

### Oliver F. and Marie Hitchcock

The Hitchcocks owned two contiguous parcels of land. One consisted of approximately 14 acres, abutting the boundary line of the territory proposed for annexation, but lying wholly *outside* of it. The other consisted of approximately 29 acres, also abutting the above boundary line, but lying wholly *inside* of it. The 14-acre parcel was in section 23 (T.8 S. R.1 W-M.D.B. & M.) and the 29-acre parcel in section 24. The section line, therefore, and the proposed annexation boundary line which followed it in this area, ran between the two parcels. The two parcels were acquired by the Hitchcocks at different times and by different deeds. They were assessed by the County of Santa Clara according to different code areas and the taxes levied thereon billed to the Hitchcocks by separate tax statements.

The Hitchcocks reside at 15060 Kennedy Road. While both parcels abut this road on the north, the Hitchcock home is located on the smaller parcel and about 400 feet from and outside of the proposed boundary line. At the time they built this home, however, in 1955, the Hitchcocks had already acquired the full acreage of both parcels.

Mr. Hitchcock testified that aside from the fact that "[t]here's an old broken-down fence between the properties" no longer in repair, there was no other "physical mark" indicating the line between the parcels and no "physical barrier such as a mountain ridge or a stream" dividing them. He further stated that he obtained his water supply from the larger parcel, that both parcels were tied together with power lines and pipe lines, that he lived on the entire 43 acres and that he considered the "whole unit" of both parcels as his

residence. Hitchcock, finding that the larger parcel had gone "back to nature pretty much" had started the work of clearing it and had installed an expensive culvert. He estimated expenditures on the 29-acre parcel in the year before the trial to be $1,000. There is evidence that he operated both parcels as a unit, that he considered the larger parcel "more like a front yard" and had in fact purchased it because of the attractiveness of its "wild and uncultivated state." He used the larger parcel "for recreational purposes," to "shoot pistols with the neighbors" and "to exercise my dog."

The trial court found, so far as is pertinent here, that all of the property comprising the 43 acres of both parcels "is one unit and constitutes one 'home place'" and that the Hitchcocks "use the property as one entire place and live on it as one entire piece" and concluded that Mr. and Mrs. Hitchcock (along with the 10 other specified persons) were registered voters residing within the territory proposed for annexation.

The learned trial judge filed an extensive memorandum opinion which has been included in the present record (Cal. Rules of Court, rule 5 (a))* and which we may consider for the purpose of understanding the foregoing findings and conclusions (*Trans-Oceanic Oil Corp.* v. *City of Santa Barbara* (1948) 85 Cal.App.2d 776, 790 [194 P.2d 148]) and the process by which the judgment was reached. (*Union Sugar Co.* v. *Hollister Estate Co.* (1935) 3 Cal.2d 740, 750-751 [47 P.2d 273].) Such opinion discloses that the trial court's determination that Mr. and Mrs. Hitchcock were residing within the area was reached by applying to the above facts the legal principles announced by Mr. Justice Wood for this court in *People* v. *City of Richmond* (1956) 141 Cal.App.2d 107 [296 P.2d 351]. After quoting from the above case, the trial judge stated: "In this instant case it will be recalled that there is no natural boundary following the annexation line, or vice versa, and the Court cannot help but conclude that the use of the property by the Hitchcocks, together with their own intention as expressed by the testimony of Mr. Hitchcock that they have always considered and used it as one single parcel of land and intend to so use it results in the inescapable conclusion that the whole parcel of property including the twenty-nine acres lying within the area to be annexed and the fourteen acres lying outside of the artificial line created by the Resolution and upon which the home is situated are in-

*Formerly Rules on Appeal, rule 5(a).

habited as a single unit by the Hitchcocks who are registered voters in the home and therefore are registered voters residing within the territory to be annexed as indicated in Section 35303 of the Government Code.'' (Original emphasis.)

We conclude that the court's findings are supported by substantial evidence, that the rule of *People* v. *City of Richmond* was properly applicable and that the court's determination based thereon was correct.

In *People* v. *City of Richmond, supra,* the boundary line transected a lot 100 feet wide by 500 feet deep so as to include the rear fourth portion thereof within the territory proposed for annexation. The dwelling house was located on the front of the lot and over 300 feet from the above boundary. This court held that the trial court's finding that the premises consisted of a single undivided parcel of land, all of which was used for residential purposes, was supported by substantial evidence and that as a consequence the registered voters resident thereon were to be counted as residing in the territory proposed for annexation. Mr. Justice Wood, speaking for the court, said: ''To annex land is one thing; to strip it of its quality of being inhabited is quite another. ■■■ The state of being inhabited is an attribute, a characteristic, a quality every bit as real as the state of being owned, possessed or farmed. Bisecting a lot by means of an annexation boundary line does not extinguish any of these qualities of the land. Each of the resultant portions continues an integral part of the whole in respect to ownership, possession, occupancy, use and residency. The power to fix the course of the boundary line does not include the power to strip the land of any of these qualities nor the power to interfere with or to cut down any of the rights or privileges of the owner or of the occupier of the land.'' (141 Cal.App.2d at p. 111.)

Observing, anent the trial court's finding, that '' [t]his concept of 'inhabited' finds support in the case law which developed prior to the legislative definition of 'uninhabited' '' in section 35303 and predecessor statutes,[2] this court quoted the following language, *inter alia,* from *People* v. *City of*

---

[2]*Richmond* thereupon notes that the Supreme Court in *People* v. *Town of Ontario* (1906) 148 Cal. 625, 641 [84 P. 205], sustained a trial court finding that certain territory '' 'taken as a whole, may fairly be said to be inhabited' '' notwithstanding '' 'the presence of several uninhabited tracts or parcels, each exceeding five acres in area,' '' *Ontario* being thereafter followed and applied in *Rogers* v. *Board of Directors of Pasadena* (1933) 218 Cal. 221, 223 [22 P.2d 509] and in *People* v. *City of Whittier* (1933) 133 Cal.App. 316, 320-321 [24 P.2d 219].

*Lemoore* (1918) 37 Cal.App. 79, 81 [174 P. 93] as "the judicially developed concept of 'inhabited' ": " 'The fact of occupancy is not limited, manifestly, to the space occupied by the building or buildings, but extends to every portion of the single tract of which that space is an undivided part. It may be difficult to formulate a description that can be applied with accuracy to every situation, [footnote omitted] but to say that any portion of a single and separate tract of land is uninhabited when people actually reside within the boundaries of that tract of land involves a contradiction in terms.' " (141 Cal.App.2d at pp. 112-113.)

Finally in answer to the objection that the concept of residence applied by the trial court would have no limit,[3] *Richmond* declares: "The nature of the use of the various parts, if there be parts, of a ranch, an estate, or a town lot, would be a significant factor to consider. Is it residential in character or is it nonresidential, such as industrial, commercial or agricultural? If it is any of the latter, does it pervade the part so used in such a manner and to such an extent as to make it unreasonable to view it also as residential? Conceivably, a person might have a home orchard in his backyard or might conduct on the premises a small business of such a character and in such a manner that it would still be within reason to say that he nevertheless resides upon the entire lot. Then, too, in some cases the existence of a permanent barrier, natural or artificial, would enter into the picture for determination; e.g., a stream, a mountain ridge, a street, or a railroad. There well may be other factors, upon occasion, factors which presently do not occur to us." (141 Cal.App.2d at p. 115.)

In *City of Port Hueneme* v. *City of Oxnard* (1959) 52 Cal. 2d 385 [341 P.2d 318], the proposed annexation of uninhabited territory having been found to include 14 registered voters, the first boundaries were withdrawn and revised boundaries substituted "so as to exclude [footnote omitted] three houses inhabited by eight of the 14 registered voters. These excluded houses were located on land which was in each case part of a larger parcel belonging to the same owner, the remainder of which larger parcel was included within the so-called 'second proposed' " territory for annexation. Mr.

---

[3]The argument proceeded as follows: ". . . that, logically extended, it would apply to a holding of 1,000 acres or more if the occupant is a registered voter and has a dwelling house in one corner of it." (141 Cal.App.2d at p. 115.) Appellant herein makes a similar contention.

Justice Schauer held the attempted annexation void as an attempt "to exclude from such annexation the habitations of eight registered voters and thus to sever such habitations from the parcels of which they were an integral part" (52 Cal.2d at p. 391) stating: "Whether the territory included within the proposed annexation was inhabited is a question of fact which does not depend upon whether the houses of the registered voters in which they ate and slept were within the boundaries of the proposed annexation but upon whether such houses were an integral part of the whole parcel (including the portion thereof which fell within the boundaries of the proposed annexation) so as to render the whole parcel inhabited. (*People* v. *City of Richmond* (1956) 141 Cal.App. 2d 107, 111-114 [296 P.2d 351].)"

The essence of the foregoing cases is that where all of the land in question can be reasonably said to be used in connection with the home located thereon as an integrated whole, all of it is inhabited. The determination of whether and to what extent the land possesses such an integrated and unitary character rests upon an overall consideration of the facts of the particular case bearing upon location, physical appearance, and use, and not on any precise formula, composed solely of units of land measurement expressed lineally or in quantity. An additional city lot, so designated on official records, lying adjacent to a home, may be an integral part of it as a garden; several acres in a rural area may be a part of a country estate for the additional recreational facilities or merely for the natural beauty which they add. These conditions are matters of common knowledge. The resultant place of residence is nonetheless indivisible although consisting of more than one lot, acre or other portion of land. Whether it is an indivisible residence is a question of fact.

In the instant case, the trial court found upon substantial evidence that all of the Hitchcock property on both sides of the proposed boundary line was "one unit" or to state it another way in terms of *Hueneme, supra,* that the Hitchcock house was an integral part of the whole 43 acres including the portion thereof which fell within the boundaries of the proposed annexation. In the light of the supporting evidence and measured by our views expressed in *Richmond,* we cannot say that such finding represents an unreasonable extension of the concept of residence.

Appellant argues that the instant case is distinguishable from *Richmond* and *Hueneme* on two bases. First it

claims that in neither of the last two cases "was the court faced with the problem of a *separate* parcel" (emphasis added) of 29 acres within the territory proposed to be annexed and 14 acres outside of it. Such claim of "separateness" is gratuitous and against the evidence. In making it, appellant chooses to disregard the court's finding that the above parcels were, so far as the Hitchcock occupancy was concerned, not two separate parcels but one unit. Secondly, it claims that *Richmond* and *Hueneme* involved what appeared to be an intentional cutting of the land undertaken for the purpose of excluding registered voters (*Hueneme, supra,* 52 Cal.2d at pp. 390-391) or of circumventing the Annexation Act of 1913 (Gov. Code, §§ 35100-35158; *Richmond, supra,* 141 Cal.App.2d at p. 119). There is nothing in either case which restricts the rule announced therein to situations involving an intentional exclusion of registered voters. The rule rests upon the character of the land involved and not the intention of the annexing municipality.

We should also mention at this point appellant's argument that where several large parcels of land are accumulated within a certain area, it is not correct to say all are occupied as a residence, for it would thus be possible to extend a person's residence to another county, another state, or theoretically across the United States. As we have already pointed out, this "extension of residence" argument was answered by us in *Richmond.* (See *Richmond,* 141 Cal.App.2d 114-115, quoted *supra.*) We are not called upon here to pass upon, and hence express no views concerning a situation where a residence overlaps a county line.

Finally appellant urges that in view of the addition of section 35008 to the Government Code in 1957 (Stats. 1957, ch. 1665, p. 3046, § 1) there is no longer any necessity for the extension of the principle of law developed in the *Richmond* case. Section 35008, added to general provisions affecting annexation of territory (§§ 35000-35012) but made applicable to the Act of 1939 here under consideration (§ 35301), provides in substance that boundaries shall not be fixed without the owner's consent so as to exclude the site of his residence dwelling, and where so fixed in violation of the section, the owner may within one year of the completion of the proceedings file a statement of violation with the annexing municipality and have the property excluded.[4] On this statute appel-

---

[4]Section 35008 provides: "The boundaries of territory proposed to be annexed shall not be fixed without the consent of the owner of the

lant constructs a bifurcated argument. The gist of the first part is that the Hitchcocks may eventually consent to the annexation of the 29 acres. To this the simple answer is that, on the record before us, they have not. The gist of the second part is that if they do not consent "and the 29-acre parcel is thereby excluded," they would have none of their property within the proposed territory. To this the equally simple answer is that the 29 acres have not been excluded but are attempted to be annexed.

While section 35008 may provide an additional remedy to such residents as the Hitchcocks, we find nothing in the statute which abrogates or restricts the right of other property owners in the territory proposed for annexation to compel termination of the proceedings on the grounds that there were not "less than twelve registered voters" within it. Appellant relies on *City of Morgan Hill* v. *City of San Jose* (1961) 192 Cal.App.2d 383 [13 Cal.Rptr. 441] dealing with the annexation of inhabited territory under the Annexation Act of 1913 (to which § 35008 is also made applicable) and involving the splitting of certain properties by the proposed annexation. It was held that the City of Morgan Hill could not urge invalidity of the annexation based on noncompliance with section 35008 since the remedy afforded by the statute was resident in the affected property owners who had consented afterwards anyhow. The method of annexation was entirely different (see comparison made by Mr. Justice Tobriner in *City of Campbell* v. *Mosk, supra,* 197 Cal.App.2d 640, 643), no jurisdictional question was presented based on required number of registered voters, and no holding was made that section 35008 established an exclusive remedy.

We are unimpressed with appellant's argument that

property so as to exclude the site of the residence dwelling of the owner of the property and to include the remainder of the property of such owner, where the site of the residence dwelling is contiguous or adjacent to the remainder of the property. If in any annexation proceedings boundary lines are fixed in violation of this section, the affected property owner may at any time before one year after the completion of the proceedings file a statement of the violation of this section with the clerk of the legislative body of the city annexing, or proposing to annex, such property and at its next meeting the legislative body shall by resolution exclude such property from the territory annexed. If the annexation proceedings have been completed, the legislative body shall transmit a certified copy of such resolution, describing the boundaries of the annexed territory, as changed, with the Secretary of State, who shall file it and transmit a certificate of the filing to the clerk of the legislative body and to the board of supervisors of the county in which the city is situated."

there was no finding that the Hitchcocks were registered voters "either within or without the territory proposed to be annexed." The court concluded that "there were twelve registered voters residing within" the territory proposed to be annexed and thereupon listed the Hitchcocks among "the names of said twelve registered voters." Although made as a conclusion of law, the above language insofar as it refers to "registered voters" would appear to be a finding of ultimate fact. ■ A finding may be considered as a valid and effectual finding of fact, even though it is included among stated conclusions of law. (*Linberg* v. *Stanto* (1931) 211 Cal. 771, 776 [297 P. 9, 75 A.L.R. 555]; *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co.* (1962) 202 Cal.App.2d 99, 106 [20 Cal.Rptr. 820]; *Petersen* v. *Cloverdale Egg Farms* (1958) 161 Cal.App.2d 792, 797 [327 P.2d 127].) ■ Mr. Hitchcock testified that both he and his wife were registered voters. An assistant registrar of voters of Santa Clara County testified that they were both registered in precinct 5783 of Santa Clara County.

We therefore hold that the trial court applying the legal principles we have set out above properly counted Mr. and Mrs. Hitchcock as registered voters residing within the territory proposed for annexation.

### Joseph A. and Linda L. Rogers

Joseph A. Rogers, Jr., and his wife, Linda L. Rogers, were the son and daughter-in-law of Joseph and Belle A. Rogers. The senior Rogers were stipulated by the parties, and found by the court, to be registered voters residing within the territory proposed for annexation. For convenience we will refer to the father as Rogers Sr. and to the son as Rogers Jr.

■ Rogers Jr. was an officer in the United States Air Force, having entered the service in 1954, at the age of 19. At that time he was unmarried and living with his parents at their residence in San Jose. He was assigned to duty with the Strategic Air Command at Lincoln, Nebraska. Joseph Jr. and Linda were married in Omaha in August 1958. Shortly after the wedding they came to California and had a reception at the home of Rogers Sr. in San Jose. Although Rogers Sr. had just purchased the property located at 15201 Deer Park Road in the territory under annexation, he and his wife were still residing in San Jose. After a short visit, Rogers Jr. and his wife returned to Lincoln where they lived in a house owned by the grandfather of Linda Rogers.

Rogers Sr. moved to his new residence on Deer Park Road, Los Gatos on October 20, 1958. In August or September 1959, Rogers Jr. visited his parents and stayed with them at their new home for about two weeks. The record is unclear as to whether his wife accompanied him. At the time of the trial in August 1960 he was assigned to duty in Spain and his wife Linda was visiting the senior Rogers in Los Gatos.

A primary election was held in California on June 7, 1960. It is important to note that this was one day after the critical date here involved when the appellant council instituted annexation proceedings by appropriate resolution. Joseph Rogers, Jr., and his wife Linda both voted in the above election by absentee ballot.

Each of the above persons signed a separate "Post Card Application for Absentee Ballot" at Lincoln, Nebraska, on May 11, 1960. These applications were mailed on May 14, 1960, to the County Clerk of Santa Clara County at San Jose and were received by him on May 17, 1960. Joseph Jr.'s application stated *inter alia* that he was a member of the Armed Forces of the United States and that for the preceding 13 years his residence in California had been at 15201 Deer Park Road, Los Gatos.[5] Linda's application, made as a spouse of a member of the Armed Forces, showed the same place of residence for 2 years previous. In return they each received a separate "Affidavit of Registration" for Santa Clara County Precinct 5783, a War Voters Ballot and a War Voters Identification Envelope. The parties agree that the above precinct is the one in which the Deer Park Road home of Rogers Sr. was located. Joseph's affidavit was subscribed and sworn to on May 19, and Linda's affidavit on May 20. Each of the affiants stated therein that his or her residence was 15201 Deer Park Road. There is no dispute that Rogers Jr. and his wife returned the above affidavits of registration together with the above envelopes containing their ballots and that their votes were counted. The present controversy centers about *when* they mailed back the above documents and *when* they were received.

An assistant registrar of voters of Santa Clara County testified that Joseph A. and Linda L. Rogers were registered voters in said county in June 1960, that their affidavits of registration were on file, and that their precinct was 5783. He

---

[5]The exhibit brought before us shows that Rogers, after stating the length of residence, first wrote and then deleted the street address of his former San Jose home. Linda did the same thing.

also testified that it was the practice of the registrar's office, in complying with pertinent provisions of the Elections Code[6] to accept registration affidavits and ballots from a war voter if the envelope transmitting them bore a postmark of a date on or before the day of election and the envelope was received within six days thereafter. If the above conditions of date were met, the envelope was not kept and the vote was counted. As a result, the envelope used by Joseph and Linda Rogers was not available to establish either the date they mailed it or the date it was received by the registrar of voters. It was therefore the testimony of the assistant registrar that the affidavits and ballots of Rogers Jr. and his wife were received *at some time prior to six days after June 7, 1960,* but that it could not be ascertained on what specific date they were *actually received.* The evidence showed that the names of Joseph A. Rogers, Jr., and Linda Rogers, his wife, did not appear on the printed precinct list for precinct 5783 which was distributed by the registrar on May 27, 1960, but that both names were added in longhand to the list maintained in the registrar's office at some time after the election.

The trial court found that when Rogers Jr. entered the military service "he did so with the intention of retaining the residence of his father and mother . . . as his place of residence"; that when he attained the age of 21 he "did form no change of intention"; that his residence after marriage in the home of his wife's grandfather in Lincoln was one "of a purely temporary nature"; that the residence of Rogers Jr. was that of his wife; that both Rogers Jr. and his wife "had registered as voters and were registered voters within the area to be annexed, to wit: At 15201 Deer Park Road, on June 6, 1960; . . ."

The opinion of the trial judge, already referred to, discloses that at the basis of the above findings was the court's determination that the affidavits of registration executed by both

---

[6]Former section 5931 of the Elections Code provided in part as follows: "At any time on or before the date of an election, an absent voter, regardless of whether he is within or without the territorial limits of the United States, may mark his ballot and transmit it, on or before the day of election, to the clerk by mail. . . ."

Former section 5932, also dealing with absent voting, provided as follows: "All ballots cast under the provisions of this chapter shall, in order that they may be counted, be received by the clerk from whom they were received within six days after the date of the election in which they are to be counted." (New § 14667 changes the above time to "not less than three days before the date of election. . . ,")

of the above parties had been received by the registrar of voters *before* the critical date of June 6, 1960, when annexation proceedings were instituted. In reaching this conclusion, the court noted that it had taken three days for the post card applications for absentee ballots to reach San Jose from Lincoln, from which the court inferred that "the normal traveling of mail time" between such places was three days, stating: "From this, the Court infers and finds that the Affidavits of Registrations signed on May 19th and 20th, 1960 were mailed on or about May 20th, 1960 to the registrar of voters at San Jose from Lincoln, Nebraska and that they were received by that office on or about May 23rd, or possibly May 24th, 1960."

Appellant attacks the above findings by claiming in effect that the foregoing evidence establishes as a matter of law that Rogers Jr. and his wife (1) did not reside within the territory, (2) were not electors in the precinct and (3) were not registered on or before June 6, 1960.

Section 35303 of the Government Code upon which this controversy is centered provides that the territory proposed for annexation shall be deemed uninhabited "if less than twelve *registered voters reside* within it" (emphasis added) on the crucial date. Appellant attempts to splinter off the concept of residence implicit in the above *italicized* language and to engraft on the statute a new and different one. The residence prescribed by section 35303, appellant argues, means actual residence ("actually living and dwelling") within the territory, not legal residence or domicile which governs registration and voting. The argument has no merit. It is clear to us that the word "reside" in its above context means the residence requisite for the registration of voters. As this court declared in *Perham* v. *City of Los Altos* (1961) 190 Cal.App.2d 808 [12 Cal.Rptr. 382], in the course of construing section 35303: "The obvious purpose of this reference to the voter registration records is to furnish a convenient and ready means of ascertaining the number of *legal residents* of the territory. Registration is based upon the affidavit of the voter (Elec. Code, § 120) which must show the affiant's 'place of residence and post-office address with sufficient particularity to identify it and to determine affiant's voting precinct' (§ 220, subd. (c); see also § 230, subd. 3). The rules for determining 'residence' for the purpose of registration and voting show that it means *legal residence* or *domicile.* (§§5650-5661, especially § 5652.)" (P. 809; emphasis added.)

Former section 5652 (now § 14282) of the Elections Code,[7] as in effect on June 6, 1960, provided: "That place is the residence of a person in which his habitation is fixed, and to which, whenever he is absent, he has the intention of returning."

Former section 5653 (now § 14283) of the Elections Code provided in relevant part: "A person does not gain or lose residence solely by reason of his presence or absence from a place while employed in the service of the United States, . . . ."

Former section 5654 (now § 14284) of the Elections Code provided in relevant part: "A person does not lose his residence who leaves his home to go into another State . . . for temporary purposes merely, with the intention of returning."

 Applying the above statutes, it is clear that the evidence summarized by us above, together with the reasonable inferences therefrom, support the trial court's findings that Joseph A. Rogers, Jr. intended to and did maintain the home of his parents as his permanent residence during the period of time here involved, that his residence was not lost by his military service or by the moving of his parents' home from one precinct to another during such service, and that his residence in the house of his wife's grandfather in Lincoln was purely temporary. Such permanent residence became also the residence of Linda Rogers upon her marriage to Rogers Jr. since "[t]he residence of the husband is the residence of the wife" (former Elec. Code, § 5660 [now § 14290]) except in certain circumstances not here applicable.

Appellant concedes that Rogers Jr. did not lose his residence when he enlisted in the Air Force (former Elec. Code, § 5653), but maintains that upon his becoming 21 years of age he could have acquired a residence of his own either in Nebraska or by retaining his San Jose residence. The trial court, as we have pointed out, found on substantial evidence that Rogers chose the latter course. Appellant then argues that although Rogers Jr. might have thus retained his parents' home in San Jose as his permanent residence, such residence was not changed to Los Gatos when Rogers Sr. moved there. However we think that the above findings, supported by the evidence, are embracive of this circumstance. After Rogers Sr. moved to the Deer Park Road dwelling in October 1958,

---

[7]Since the present Elections Code of 1961, in effect September 15, 1961, represents extensive amendments and changes in the former Elections Code, we will refer to the pertinent sections as in effect on June 6, 1960, by the numbers used in the former (1939) Elections Code.

Rogers Jr., still in military service, made no attempt to establish a permanent residence elsewhere. He and his wife continued their temporary residence in her grandfather's house. In the next year, 1959, he visited his father's Los Gatos home in much the same way he had visited the San Jose home in the preceding year. In 1960 he registered to vote giving the Deer Park Road address as his residence in both his application for an absentee ballot and in his affidavit of registration. Voting registration is "[o]ne of the important acts to be considered" in determining residence (*Ballf* v. *Public Welfare Dept.* (1957) 151 Cal.App.2d 784, 788 [312 P.2d 360]). From the above and other evidence which we have summarized, viewed in the light of the provisions of section 5653 of the Elections Code, *supra,* that a person does not lose residence by reason of his absence while employed in the service of the United States, the trial court could properly infer that Rogers Jr. intended that his permanent residence should remain at the home of his father after the latter moved to Los Gatos. This, we think, was a reasonable inference. The alternate suggested by appellant, namely, that absent any proof of domicile in Nebraska, Rogers Jr. "retained the San Jose Precinct as his residence" even though the father had moved and the son had no fixed place of residence there, would lead to an absurdity.

We turn to appellant's second point of attack. It urges that "Rogers, Jr. did not qualify as an elector, because he had not been a resident 'in the election precinct (Los Gatos) fifty-four (54) days next preceding the election,' as required by California Constitution Article II, Section 1." This argument has no merit. The affidavit of registration of Rogers Jr., introduced into evidence by *appellant,* contained the following statement: "I will be at least twenty-one years of age at the time of the next succeeding election, a citizen of the United States ninety days prior thereto, and a resident of the State one year, of the County ninety days, and of the Precinct fifty-four days next preceding such election, and will be an elector of this County at the next succeeding election." Furthermore, as we have pointed out, the trial court found on substantial evidence that Rogers Jr. was a resident within the territory in question from the time his father moved there in October 1958. Cases cited by appellant dealing with the illegality of votes cast by nonresidents are not here pertinent. The evidence shows that the votes cast by Rogers Jr.

and his wife in the primary election held on June 7, 1960, were counted and were never declared illegal.

We conclude, therefore, that the trial court properly determined upon substantial evidence that Rogers Jr. and his wife were registered voters residing within the territory in question. But the crucial question raised by appellant's third objection remains: Were they registered voters on June 6, 1960? As we have set forth in detail above, the trial court answered this question in the affirmative by inferring that the affidavits of registration were mailed in Lincoln on or about May 20, 1960, from the fact that they were signed on May 19 and 20, and by further inferring that they were received by the Santa Clara County Registrar on or about May 23, or May 24, 1960, from the fact that incidents pertaining to the mailing and receipt of the previous applications disclosed the normal mail time to be three days. On this reasoning the court concluded that the Rogers became registered voters no later than May 24, 1960, and were therefore to be counted as such on June 6, 1960.

A legal inference can be drawn only from the facts proved. It must be reasonably and logically drawn and it may not be based only on imagination, speculation, supposition, surmise, conjecture or guess work. (Code Civ. Proc., §§ 1958, 1960; *Eramdjian* v. *Interstate Bakery Corp.* (1957) 153 Cal.App.2d 590, 602 [315 P.2d 19]; *Marshall* v. *Parkes* (1960) 181 Cal.App.2d 650, 655 [5 Cal.Rptr. 657]; 18 Cal. Jur.2d, Evidence, § 60, pp. 479-481; Witkin, Cal. Evidence, § 121, p. 145.) We find in the record no fact established from which the trial court could have inferred that the affidavits of registration were mailed by Rogers Jr. and his wife from Lincoln "on or about" May 20, 1960. It cannot be logically concluded that these documents were mailed on the day of their date. The only evidence in the record is that they were received by the registrar of voters in San Jose at some time prior to June 13, 1960, and that at the time of their receipt they bore a postmark showing mailing on or before June 7, 1960, the date of the election. On oral argument, counsel for respondent with commendable candor conceded that the court's determination that the affidavits were received " on or about May 23rd, or possibly May 24th, 1960" was without any support in the record. If the court's conclusion that the Rogers were registered voters in the area on the critical date is to be upheld, it must therefore be on another basis.

It has been established by uncontradicted evidence that

Rogers Jr. and his wife registered and voted as absentee war voters. (Elec. Code, former §§ 48, 132.6, 220, 230.[8]) The provisions quoted below make it clear that under the applicable sections of the Elections Code then in effect, an absentee war voter received his ballot and affidavit of registration at the same time, and "on or before the day of election" executed the affidavit and returned it to the county clerk with his ballot enclosed in an identification envelope. Thus, in such cases, the clerk and the registrar of voters received the affidavit of registration and the ballot at the same time.

Former section 132.6 then continues in its third paragraph: "Upon receipt thereof *within the time required by law* for the *return of the absent voter's ballots,* the clerk shall examine the affidavit of registration and if it appears therefrom that the affidavit of registration is properly executed and that the facts stated therein are such as would have entitled the applicant to register and vote at the election, if the affidavit had been executed in this State and within the time required by law, then the affiant *shall be deemed a duly registered elector as of the date of the affidavit* to the same extent and with the same effect as though he had registered in proper time prior to the election before the clerk." (Emphasis added.) Former section 5932 of the Elections Code which we have already set forth (see footnote 6) prescribed that absent voter's ballots had to be received by the clerk "within six days after the date of the election. . . ."

It has been established by uncontradicted evidence

---

[8]Former section 48 provided: " 'War voter' refers to an elector who comes within one of the following categories:

"(a) Member of the armed forces of the United States or any auxiliary branch thereof.

" . . . . . . . . . .

"(f) Spouses and dependents of the persons enumerated herein. . . ."

Former section 132.6 provided, in its first two paragraphs, as follows: "Whenever any person not a registered elector, or any person who has changed his residence since last registering, who qualifies under the provisions of Section 48 shall apply in writing or in person to the clerk for an absent voter's ballot and the application shows that he is a war voter, and that his place of residence is in the county, the clerk shall mail to the applicant with the absent voter's ballot, or deliver to him, blank forms of registration affidavit as prescribed in Article 3 of this chapter to be executed in duplicate by the applicant.

"If the applicant desires to vote at the election he shall, *on or before the day of the election* and before marking the absent voter's ballot, execute the affidavit of registration under the provisions of Section 120, 132, or 132.5 . . . and return the same, in the return envelope but not in the identification envelope, together with the absent voter's ballot enclosed in the identification envelope, to the clerk from whom the same were received." (Emphasis added.)

in the instant case that the affidavits of registration executed by Rogers Jr. and his wife were received by the county clerk of Santa Clara County within such permissible period, although the precise date of receipt is not ascertainable and that the ballots of these parties were counted. Such being the case, by virtue of the third paragraph of section 132.6, Rogers Jr. was to be deemed a "duly registered elector" as of May 19 and his wife such as of May 20, 1960.

Appellant urges upon us a number of reasons why section 132.6 should not be so applied. Before we take these up, we make one preliminary observation. Former section 132.6 of the Elections Code states that upon the proper and timely return of the absent war voter's affidavit of registration, he shall be deemed a duly registered *elector,* while section 35303 of the Government Code prescribes the test of uninhabited territory on less than 12 registered *voters.* As we said in *Perham* v. *City of Los Altos, supra,* 190 Cal.App.2d 808, 810, there is no substantial difference in the use of such terms when considered in connection with ascertaining residence of registered voters. As defined by former and present section 21 of the Elections Code " '[v]oter' means any elector who is registered under the provisions of this code." The employment of the two terms "elector" and "voter" is not a factor in the problem.

Appellant takes the position that (1) "registered voters" as used in section 35303 of the Government Code does not include "registered war voters" and (2) even if it does, the term "registered voters" should only include those persons whose affidavits of registration are actually in the possession of the registrar of voters and on the official precinct list available for inspection in connection with annexation proceedings.

We think that appellant confuses the issue before us which is a question of *residence* and *registration* (*Perham, supra,* 190 Cal.App.2d at p. 809) by coupling with it the question of *voting.* Admittedly, the latter question easily obtrudes upon the former in the instant case, since the primary election for which the Rogers registered, occurred one day after the critical date for determining whether there were less than 12 registered voters in the area.

Be that as it may, we are not concerned with the question of voting. We refer to *Perham, supra.* In that case, similar proceedings under the Act of 1939 here involved were declared void because on the day when the petition for annexation was filed, there were 14 registered voters within the territory pro-

posed for annexation. It was claimed on appeal that 8 of the 14 had registered less than 54 days before the crucial date, leaving only 6 who could be considered "registered voters." This court affirmed the judgment, holding that the 8 registered residents should be counted, even though they might have been ineligible to vote if an election had been held on the crucial day for counting under Government Code section 35303. We said: "It is a question of residence and registration, not a question of voting, on that day." (P. 809.) *Perham* becomes a guidepost in the instant case where an election *was* held, not on the crucial day, but the *day after*. Despite its proximity in time, we are still concerned only with *registration* and not with other circumstances pertaining to voting.[9]

As we have pointed out, the resident registered voters contemplated by section 35303 of the Government Code are those determined to be such according to the provisions of the Elections Code. (*Perham* v. *City of Los Altos, supra,* 190 Cal.App. 2d 808.) We fail to find, nor has appellant referred us to, any provisions of the Elections Code creating different categories of registered voters. All voters must be registered according to the Elections Code (former §§ 21, 70) by affidavit of registration (former § 120) according to a specified content and form (former §§ 220, 230). The *manner* of effectuating the act of registration may vary, as for example in the case of absentee registration (former § 132) or absentee war voter registration (former § 132.6), but the result is uniform. All, whether making the affidavit in person before the county clerk or returning it by mail, become registered voters. We can therefore find no reason for the conclusion that an absentee war voter who registers according to the applicable statute (former § 132.6) becomes a member of any different or separate class of registered voters. It is significant that the statute

---

[9]*Perham* v. *City of Los Altos, supra,* was decided on April 5, 1961. Shortly thereafter § 35303 was amended by Stats. 1961, ch. 1988, p. 4183, § 15 approved by the Governor July 19, 1961, and effective September 15, 1961, to give a new definition of uninhabited territory. Section 35303, as thus amended, now provides: "For purposes of this article territory shall be deemed uninhabited if less than 12 persons *who have been registered to vote within the territory for at least 54 days* reside within the territory at the time of the filing of the petition for annexation or the institution of proceedings on motion of the city legislative body." (Emphasis added.) We are not called hereupon to determine the effect of such amendment on the registration of absentee war voters covered by §§ 250-254 of the 1961 Elections Code, which represent a reenactment of former § 132.6 of the 1939 Code without substantial change. It is to be noted that the retroactive effect of such registration is still provided for in new § 252 in language identical to that used in former § 132.6.

which provides for this procedure of registration did not so state. On the contrary, it specifically stated that such a person became a duly registered elector *"to the same extent and with the same effect* as though he had registered in proper time prior to the election before the clerk" (former § 132.6; emphasis added). We hold therefore that a war voter (former § 48) who registers according to law is a "registered voter" within the purview of section 35303 of the Government Code.

 Appellant urges the sequential point that such a registered voter should not be counted unless his affidavit of registration has been processed as provided by former section 331 (now § 422) of the Elections Code.[10] It is appellant's position that it is the *bound* and *indexed* book of affidavits of registration, compiled pursuant to such section, which constitutes the voter registration records and that only the names therein contained were the registered voters residing in the proposed territory on the crucial day. We disagree. Former section 120 (now § 200) of the Elections Code provides: "No person shall be registered as a voter except by affidavit of registration. The affidavit shall be made before the county clerk and shall set forth all of the facts required to be shown by this chapter." Former section 121 (now § 202) provides that the county clerk "may take the affidavit of registration in any adjoining county." Former section 123 (now § 204) states that the county election board may provide "for the registration of electors" in precincts and "at specified times and places" other than the office of the county clerk. Former section 125 (now § 205) provides that "[a]ny registration which may be made at the main office for registration in any city and county may be made and taken in any place in the city and county in the manner provided by rules and regulations made by the election board." We are persuaded that, in the light of the foregoing sections, registration is effected when the requisite affidavit is "made" by the voter and "taken" by the county clerk or other authorized person. The elector then becomes a "registered voter."

 Appellant's insistence that the bound precinct reg-

---

[10]Former § 331 provided: "Within fifteen days after the last day of registration for any election the county clerk shall arrange the original affidavits of registration for each precinct in which the election is to be held, alphabetically by surnames in each precinct, and bind them into books with an alphabetical index. Each book shall be marked on the outside with the name or number of a precinct, and shall contain all, and only, the original affidavits of registration of the voters residing within the precinct."

istration books constitute the sole list of registered voters is grounded on the erroneous premise that in the instant problem we are concerned with the question of voting. Former section 331 is coordinated with former section 122 to control the closing of registration and listing of voters for a particular election. Former section 122 (now § 203) provides that " [r] egistration of electors shall be in progress at all times except during the 53 days immediately preceding any election, when registration shall cease *for that election* . . ." (emphasis added). It in effect closes, not all registration, but registration for a particular election. As we said in *Perham* v. *City of Los Altos, supra,* 190 Cal.App.2d 808, 810, " [t] hat, obviously, is a limitation imposed to facilitate the orderly and accurate preparation of *voting lists for use at any election*" (emphasis added). Former section 331 then comes into play prescribing that within 15 days of such closing of registration, precinct registration books shall be prepared. All of the foregoing has to do with the question of *voting*. The act of registration was completed when the affidavit of the voter was properly made and taken. It did not depend upon its being incorporated in the precinct register, *so far as registration is concerned*. Thus, persons may be registered voters although ineligible to vote at the next election (cf. *Perham, supra*) or because under other registration procedures it was not contemplated that their affidavits of registration be subject to the compilation requirements of section 331.

Former section 132.6 provides in substance for the filing of an absentee war voter's affidavit of registration by transmission to the clerk on or before the date of election with receipt thereof permissible within six days thereafter (former Elec. Code, §§ 132.6, 5932). Quite obviously, such affidavits might be legally "made" and "taken" long after the time prescribed for the compilation of precinct registration books.

We must recognize that, if the "registered voters" residing in the territory proposed for annexation are not confined to those names contained in the precinct registration book, some difficulty will ensue in ascertaining the number of registered voters. Nevertheless we feel the proper question is *who are the registered voters, not who are the registered voters* qualified to vote at any election. Appellant maintains that the recognition of absentee war voter's registration and the retroactive effect of it pursuant to section 132.6 should not be permitted to void the instant annexation proceedings. This may be an unfortunate result but nevertheless, the law, as we view

it, permits it. We revert to *Perham*. It is a question after all of residence and registration. Section 35303 of the Government Code ordains that we count all registered voters residing in the territory on the crucial date. Former section 132.6 permits absentee war voter registration and ordains its retroactive effect ''as of the date of the affidavit'' of registration. This section, too, controls the counting of registered voters.

We hold therefore that for the foregoing reasons Mr. and Mrs. Joseph A. Rogers, Jr., were also properly counted as registered voters residing within the territory proposed to be annexed. With Mr. and Mrs. Hitchcock, this brought the total number to 12 and justified the trial court's conclusion that appellant had exceeded its jurisdiction.

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied December 13, 1962, and appellant's petition for a hearing by the Supreme Court was denied January 16, 1963.