TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 23-402 |
| of | : | |
| | : | November 30, 2023 |
| ROB BONTA | : | |
| Attorney General | : | |
| | : | |
| CATHERINE BIDART | : | |
| Deputy Attorney General | : | |

---

SHAKIR KHAN has applied to this office for leave to sue RAMON YEPEZ in quo warranto to remove Yepez from his seat on the Lodi City Council. Khan, the former holder of that seat, alleges that the City Council unlawfully determined that Khan's seat was vacant and therefore unlawfully appointed Yepez to fill it.

We conclude that there are substantial issues of fact and law as to whether the City Council lawfully determined Khan's former seat was vacant and (as a result) whether the Council lawfully appointed Yepez to fill it. Consequently, and because the public interest will be served by allowing the proposed quo warranto action to proceed, we GRANT the application for leave to sue.

## INTRODUCTION

Shakir Khan was elected to the Lodi City Council in 2020 and served as a councilmember until the City Council, based on Khan's purported resignation, determined his seat vacant on February 28, 2023.

The events leading to Khan's purported resignation began on the morning of February 16, 2023, when local authorities arrested him on election fraud charges and then took him to the San Joaquin County Jail, where he was held in custody. Around 4 p.m. that afternoon, the Mayor of Lodi went to the jail and met with Khan in an interrogation

1

23-402

room.  After Khan purportedly resigned at that meeting, the City Council declared Khan's seat to be vacant, and subsequently appointed Yepez to fill it.  Khan maintains that he did not agree to resign during that meeting and claims that, even if he had, he timely withdrew any such resignation and thus no vacancy arose.

Khan's attorney sought a temporary restraining order in federal court, seeking to prevent the Council from filling Khan's seat.  The court denied the order, and in doing so referred to the availability of a quo warranto lawsuit to challenge the Council's actions.[1] Khan then filed the quo warranto application before us.  Yepez, the City of Lodi, and the Lodi City Council filed a joint opposition.  For simplicity and brevity, and because these parties' interests and positions are aligned, we attribute the joint opposition's arguments to the City.

## ANALYSIS

Quo warranto is a civil action used, among other purposes, to challenge an incumbent public official's right or eligibility to hold a given public office.[2]  Code of Civil Procedure section 803 authorizes this form of action, stating that it "may be brought by the attorney-general, in the name of the people of this state, upon his own information, or upon a complaint of a private party, against any person who usurps, intrudes into, or unlawfully holds or exercises any public office . . . within this state."[3]

When a party seeks to pursue a quo warranto action, it must first obtain the Attorney General's consent to do so.[4]  In determining whether to grant consent, we do not attempt to resolve the merits of the controversy.[5]  Rather, we consider (1) whether quo

---

[1] See Defendants' Verified Statement of Facts, Exhibit 14 (Order Denying Plaintiff's Motion for a Temporary Restraining Order, *Khan v. City of Lodi*, Case No. 2:23-cv-00566-DAD-KJN (E.D. Cal.), March 30, 2023, at pp. 7-9), on file.

[2] See Code Civ. Proc., § 803; *Nicolopulos v. City of Lawndale* (2001) 91 Cal.App.4th 1221, 1225; *People ex rel. Pennington v. City of Richmond* (1956) 141 Cal.App.2d 107, 117.

[3] Code Civ. Proc., § 803; see *Rando v. Harris* (2014) 228 Cal.App.4th 868, 873; 97 Ops.Cal.Atty.Gen. 12, 14 (2014).  In this context, the term "private party" refers to any "individuals or entities other than the Attorney General."  (*People ex rel. Lacey v. Robles* (2020) 44 Cal.App.5th 804, 826; see *id*. at pp. 815, 817.)

[4] *Internat. Assn. of Fire Fighters v. City of Oakland* (1985) 174 Cal.App.3d 687, 693-698.

[5] See, e.g., 95 Ops.Cal.Atty.Gen. 43, 49 (2012) ("To be clear, it is not our role here to predict how a court would ultimately resolve the question," and granting "leave is not an indication that the position taken by the relator is correct, but rather that the question

2

warranto is an available and appropriate remedy; (2) whether the application raises a substantial issue of law or fact that warrants judicial resolution; and (3) whether authorizing the quo warranto action will serve the public interest.[6] Here, the answer to all three questions is "yes," and we therefore grant leave to sue.

### 1. Quo Warranto Is an Available Remedy

For quo warranto to be an available remedy in this context, the party seeking leave to sue must be challenging a defendant's right to hold a public office.[7] The position of city councilmember is a public office for quo warranto purposes.[8] Here, Khan challenges Yepez's right to hold Khan's former city council seat based on Khan's allegation that the seat was unlawfully determined to be vacant and that Khan, not Yepez, is legally entitled to hold it.

Courts have determined that this is a proper use of quo warranto. For example, the Court of Appeal in *Klose v. Superior Court* construed the California Supreme Court's opinion in *People ex rel. Tracy v. Brite* as holding, "where the appointing power considers a vacancy to exist, it may appoint a successor," and "when it does so appoint[,] the official succeeded may by quo warranto question whether there was any vacancy."[9] Accordingly, where there is a dispute on the existence of a vacancy, as here, the ousted officer is assured that "he may always have his day in court before it can be conclusively adjudged against him that the office was vacant at the time the [successor's] appointment was made."[10]

Based on *Klose*, we have on previous occasions granted an ousted official leave to sue in quo warranto to test the appointed successor's right to the office for which a vacancy had been declared.[11] Given the similar posture here, we conclude that quo

---

should be judicially determined and that quo warranto is the only proper remedy").

[6] *Rando v. Harris*, *supra*, 228 Cal.App.4th at p. 879; 72 Ops.Cal.Atty.Gen. 15, 20 (1989).

[7] 102 Ops.Cal.Atty.Gen. 20, 22 (2019); 96 Ops.Cal.Atty.Gen. 36, 41 (2013).

[8] 102 Ops.Cal.Atty.Gen. 56, 60 (2019).

[9] *Klose v. Superior Court* (1950) 96 Cal.App.2d 913, 917; see *People ex rel. Tracy v. Brite* (1880) 55 Cal. 79.

[10] *Klose v. Superior Court*, *supra*, 96 Cal.App.2d at p. 918, quoting *People ex rel. Fleming v. Shorb* (1893) 100 Cal. 537, 541; see also *Nicolopulos*, *supra*, 91 Cal.App.4th at pp. 1228-1229 (quo warranto procedure providing for restoration to office and damages satisfies due process).

[11] See 103 Ops.Cal.Atty.Gen. 33 (2020) (granting leave to sue in quo warranto to ousted councilmember whose seat was declared vacant on residency grounds);

3

warranto is an appropriate remedy to test Yepez's right to hold the office of councilmember upon the City Council's determination that Khan's seat was vacant.

## 2. Substantial Issues of Fact and Law Warrant Judicial Resolution

As noted above, our role is limited to determining whether substantial issues of law or fact exist that warrant judicial resolution. To do so, we begin with a review of the statutes that govern a councilmember's resignation and vacancy, then review the parties' arguments and relevant facts as they have been presented to us. After analyzing those arguments and facts in light of the relevant statutes and other legal principles, we conclude that substantial issues of law and fact warrant judicial resolution of whether Khan resigned and a vacancy ensued.

### *Government Code Provisions on Councilmember Resignations and Vacancies*

The Government Code directly addresses councilmember resignations and vacancies and therefore governs the issues in dispute.[12] Section 1750(f), which we will refer to as "the resignation statute," provides that a councilmember's resignation must be (1) in writing and (2) "made . . . to the clerk of the legislative body of their corporation." Section 1770(c)(2), which we will refer to as "the vacancy statute," provides that a vacancy arises in a councilmember's office "upon the delivery of a letter of resignation by the resigning council member to the city clerk."[13] Neither party has identified a

---

79 Ops.Cal.Atty.Gen. 21 (1996) (same but granting leave to mayor); 73 Ops.Cal.Atty.Gen. 197 (1990) (same but granting leave to school district personnel commissioner).

[12] All further statutory references in the text are to the Government Code unless otherwise stated.

[13] A more complete recital of the relevant language is below.

> An office becomes vacant on the happening of any of the following events before the expiration of the term:
>
> . . .
>
> (c)(1) His or her resignation, except as provided in paragraph (2).
>
> (2) In the case of the office of city council member, upon the delivery of a letter of resignation by the resigning council member to the city clerk. The letter of resignation may specify a date on which the resignation will become effective.

(Gov. Code, § 1770, subd. (c).) A vacancy also arises upon conviction of a felony, but there has been no conviction here. (See Gov. Code, § 1770, subd. (h).)

4

statute specific to *withdrawal* of a councilmember's resignation, however, and we are not aware of any such statute.

### *Factual Background*

The mayor of Lodi went to meet Khan around 4:00 p.m. on February 16, 2023, at the San Joaquin County jail, where Khan had been held since his arrest earlier that day. Khan's purported resignation occurred at this meeting, which was recorded by an officer's body camera and later transcribed. Our summary of the meeting derives solely from that video and transcript.

During the meeting, Khan told the mayor about his arrest and said that he had not been allowed any contact with his family. Khan stated that he did not understand certain of the election fraud charges that had been brought against him. The mayor explained those charges and informed Khan that his arrest was on the national news. In response to a question from the mayor about his hearing aids, Khan said that he did not have his hearing aids because he had not been allowed to take them when arrested. Returning to the subject of the charges, Khan continued that he had told the city manager the day before that he was going to "fight this." Khan then told the mayor, "You know, I don't care right now," and asked the mayor what he should do.

The mayor responded that he thought Khan should step aside because "[i]t looks bad," and asked, "Is it even worth it at this point?" He added that the news stories would continue as long as Khan was on the City Council. He stated: "It's one thing to be here. The worst thing is to have your kids watching you." Khan replied, "Yeah, watching me, yeah." The mayor asked "why even deal with that?" He then told Khan "how about you fight it," adding that if Khan ended up cleared of the charges, he would win the next election.

Khan replied that he would probably do that, and thanked the mayor for coming. The mayor then said, "It's worth it, Shak," and Khan said "Yeah, yeah, no, that's what I think" and that he wanted to "personally thank" the mayor for coming and that this was why he "wanted to make sure" he got the mayor's advice. Khan said "I'll do that," and the mayor replied, "Yeah, I think, just to save yourself the headache" that "I could—I'm happy to put out a statement saying 'I talked to Councilmember Khan. He agreed to resign, and I think that's the right course.'" Khan responded, "Yeah," and said he would talk to his lawyer tomorrow and "then just have him, you know, make a statement."

Khan asked the mayor "if that's better," and the mayor replied, "Yeah, well, so if it's okay with you, I would like to just [pausing to ask an officer for a pen and paper] write out something for you." Khan said "Okay." The mayor then said to Khan that, if he agreed to it, they could just sign it right there, to which Khan said, "Okay." The mayor said, "then I could go to the media, and at least it gets rid of the national—you know what I'm saying?" to which Khan said, "Okay. Yeah." Khan added, "Because I

know the media is going crazy right now—right? —outside," and the mayor agreed. Khan mentioned that "they" had come and tried to talk to him, but that he had refused.

Khan then asked the mayor if he had spoken to the city manager, and what the city manager thought. The mayor stated he had spoken to him, as well as to the city attorney—to "everybody"—and that they all thought he should resign. Khan asked, "Should resign, right?" The mayor confirmed and added that he wanted to talk to someone at the mosque too, and Khan replied that they would not say anything. The mayor then said that he would write "it" from Khan's point of view, and started to ask Khan if that was okay, but before he finished asking, Khan said it was fine.

Khan read aloud the mayor's handwritten statement: "Mayor Mikey Hothi and Shak Khan have spoken and believe that the best course of action at this time is for Shak Khan to resign from his Lodi City Council seat." Khan stated that he wished to include, "until his name is . . . cleared from charges." In response, the mayor added, "He plans to fight the charges and clear his name," and asked Khan if he wanted that, and Khan gestured affirmatively.

Khan asked again if the mayor had talked to the city manager and city attorney. The mayor confirmed as much and again said that he had talked to "everybody." He also said that he had talked to the district attorney, and to a person named Waqar. The mayor added that he "tried to talk to as many people as possible." Khan asked if they all thought it was better that he resign. The mayor responded, "They just all listened and said it makes sense for you to resign." The mayor added that Waqar did not say one way or the other, but the mayor had wanted to talk to someone from Khan's community. Khan repeated "Yeah" a few times, then stated, "As long as the city attorney and city manager think[] it's better for the city, you know, I'll do whatever is better for the city."

The mayor stated he appreciated that and indicated where to sign the document, and Khan signed it.[14] The mayor repeated his appreciation, and Khan replied, "No problem, Mikey" and "Good luck." Khan repeated that he was going to do whatever he could to fight the charges, and added that "it was nice—you know, good leadership and good working with you," to which the mayor replied "Yeah." Khan then stated, "I'll try again." The mayor said that he was praying that it all works out for Khan and his family, and Khan replied that it was a hard time and that "they're after me like crazy." Khan added, "You know, I know this was the whole reason. And, you know, if they want this, I'll give it to them," to which the mayor stated, "Yeah. Okay." The mayor again said, "I appreciate it, Shak," and Khan replied, "Thank you, Mikey," with further exchanges of parting pleasantries. As the mayor was leaving, an officer told Khan to take a seat. Khan

---

[14] The mayor also signed the document, but it is unclear when the mayor signed the document.

asked about using the phone to call his wife, and the officer stated that they would "take care of [him] right now."

The signed statement in its entirety provides:

> Mayor Mikey Hothi & Shak Khan have spoken & believe the best course of action at this time is for Shak Khan to resign from the Lodi City Council effective immediately.  He plans to fight the charges against him & clear his name.

After the meeting, Khan was allowed to make phone calls.  It is undisputed that (1) within 15 minutes of the meeting ending, Khan's brother patched him in on a call to the mayor, and (2) during this call, Khan told the mayor that he had spoken to his lawyer, who said Khan should not resign, and that Khan did not wish to resign.  According to Khan, he further stated on this phone call that he did not authorize the mayor or anyone else to release any statement on his behalf.  It is undisputed that the mayor told Khan it was "too late" to withdraw his resignation, and that the media had already been informed and were on their way to interview the mayor in front of the jail.  The mayor then texted the city clerk an image of the signed document, and after his media engagements, drove to the Lodi City Hall and delivered the document in person to the city clerk, who stamped it as "received" that same day, February 16, 2023.

The next day, having been released from jail, Khan sent the city clerk and city manager emails stating that he did not resign and had not authorized anyone to release a statement on his behalf.  Khan did not submit a copy of such emails to this office, but the City has not disputed their existence.

### *Was There a Lawful Resignation?*

We begin with the parties' arguments surrounding whether the document Khan signed during his jailhouse meeting with the mayor was a resignation in the first instance.  Khan does not address the resignation statute identified above, section 1750(f).  Instead, he asserts that the document *by its own terms* is not a resignation because it does not state that he *is* resigning, but states that he and the mayor *believe* at that time it *would be* the best course of action for him to resign.  He also asserts that a resignation would use words such as "I resign."  Khan argues that although one might agree that resigning is the best course of action, such agreement is not the same as accomplishing that course of action, and one might later decide not to follow through with the resignation.

In addition, Khan attests in a supporting declaration that he was under duress and psychological pressure, and felt he had to sign the document.[15]  Khan points out that he

---

[15] In connection with this assertion, Khan cites *Leithliter v. Board of Trustees* (1970) 12

23-402

signed the document near the end of the day on which he had been awakened to being arrested, and then confined in jail without family contact or his hearing aids, during a visit by the mayor who advised him to resign. The mayor stated that he would like to write "something" for Khan after Khan had asked if it was better for his attorney to make a statement. The mayor also told Khan that others agreed that he should resign— including the district attorney who brought the charges on which Khan was arrested—and Khan attests that he was afraid of angering the district attorney. At the end of the meeting, Khan stated that "they're after me like crazy," that he knew "this was the whole reason," and that he would give this to them if that is what they wanted.

For its part, the City argues that Khan understood that the document was a resignation, not an agreement to resign in the future, because the document stated it was "effective immediately." The City also argues that Khan's statements and the surrounding events, including Khan's anxiety about the media, show that Khan intended the document to be a resignation. The City also maintains that the video and transcript of the meeting show that Khan freely agreed to resign and understood that the document was a resignation.

As support for its interpretation that the document was a resignation that was effective immediately, the City relies on multiple Civil Code statutes that govern contracts. The first statute provides that "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title."[16] The second provides that a "contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."[17] The third provides that a "contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."[18] We need not determine whether these particular statutes could apply here, because regardless of their applicability, they articulate guiding pillars of statutory interpretation— discerning intent from words and context—that are generally useful in discerning the meaning of a document.[19]

---

Cal.App.3d 1095, 1100, in which the Court of Appeal observed that a coerced resignation "would be of no effect."

[16] Civ. Code, § 1639.

[17] *Id*., § 1647. In connection with this statute, the City also cites Civil Code section 1650, which states, "Particular clauses of a contract are subordinate to its general intent."

[18] *Id*., § 1643.

[19] See, e.g., *Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 673 (espousing principles of statutory interpretation).

23-402

The resignation statute requires a councilmember's resignation to be (1) in writing, and (2) made to the clerk. We first address the requirement that a resignation be in writing. The writing prepared by the mayor is at least arguably noncommittal in that it states a belief that resigning is "the best course of action *at this time*," as Khan emphasizes, although it also purports to be "effective immediately," as the City emphasizes. The City argues that Khan's intent to resign is shown by his statements, and anxiety about the media and his knowledge that the mayor would be giving the media his statement. Indeed, Khan contemporaneously made and apparently understood (despite not having his hearing aids) statements that would indicate he viewed the wording as a resignation. And Khan's and the mayor's parting exchanges, including Khan's statement that it had been nice working together, arguably reflect a view that their working relationship had come to an end. While this sequence of events could also support an interpretation that Khan simply wanted the media to go away and did not ultimately intend to resign, we believe the wording of the note that Khan signed may be more reasonably understood as stating Khan's intent to resign, at least at the time he signed it.

Turning to the requirement under section 1750(f) that the writing be "made" to the clerk, the underlying facts cast considerable doubt as to whether that requirement was satisfied.[20] By its use of the term "made" to the clerk, the resignation statute appears to require that a resigning councilmember both intends to and does in fact provide the resignation to the clerk of the body from which the member intends to resign, and our review of the relevant authorities supports that interpretation.

The Court of Appeal decision in *People ex rel. Webb v. Marsh* is instructive here. In that case, the Court of Appeal discussed a predecessor statute on resignations (former Political Code section 995), and concluded that delivery to the clerk in accordance with a resigning officer's intent constituted "full compliance" with the statute's requirements:[21]

---

[20] In its opposition, the City recites this statutory requirement but does not discuss it in detail, and simply maintains that the document was delivered and became effective upon signing because it stated that it was "effective immediately." But the fact that a resignation document says it is "effective immediately" does not necessarily make it so. And more to the point, the City has failed to explain how those terms might somehow inform the legal question whether the writing was made to the clerk.

[21] See *People ex rel. Webb v. Marsh* (1916) 30 Cal.App. 424, 428, disapproved on other grounds by *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 206; see also Stats. 1917, ch. 40, p. 38, § 1, former Pol. Code, § 995 ("Resignations must be in writing, and *made* as follows: . . . 4. By all county and township officers not commissioned by the governor, *to the clerk* of the board of supervisors of their respective counties," italics added).

9

> Section 995 of the Political Code declares the mode in which a public officer may resign his office, namely, that it must be in writing, and, if the incumbent be a county officer not commissioned by the Governor, that it shall be made to the clerk of the board of supervisors. In the case at bar it was in writing, and since it was, as intended to be by appellant, delivered to and filed with the clerk of the board of supervisors, it was made in full compliance with the statute.[22]

This final sentence emphasizes that the officer's resignation was valid since it was made in writing *and* "since it was, as intended . . . , delivered to and filed with the clerk." If Khan intended as much, that intent was not made express in the document. And it is undisputed that Khan did not ever ask the mayor to send or take the document to the clerk. The City asserts that Khan made "no prohibitions on the Mayor's handling or use of the resignation document." But we question whether such unexpressed "prohibitions" are tantamount to presenting (or authorizing the presentation of) a resignation to the clerk. Moreover, Khan had told the mayor on the phone that Khan did not want to resign *before* the mayor transmitted the document to the clerk via text message.

Relevant here is *McKelley v. Turner*, a Court of Appeal case which also arose under the predecessor statute on resignations (former Political Code section 995), and cites the *Marsh* case discussed above. In *McKelley*, a board of supervisors sought the sheriff's resignation, and the sheriff hired an attorney to represent him in the matter; nevertheless, the sheriff's attorney went to the sheriff's home and induced him to sign a prepared written resignation.[23] The sheriff told his attorney that he was ill and instructed his attorney not to deliver it until the next day, until he knew how he was feeling.[24] Defying these instructions, the attorney delivered the document to the clerk after leaving the sheriff's house.[25] The Court determined that the resignation could not have become effective, because the sheriff had terminated the attorney's authority to deliver the sheriff's resignation.[26] The Court stated:

> The writing signed by the petitioner [sheriff] could have become effective as a resignation only upon its delivery to the clerk of the board of

---

[22] *People ex rel. Webb v. Marsh*, *supra*, 30 Cal.App. at p. 428, disapproved on other grounds by *Armistead v. State Personnel Board*, *supra*, 22 Cal.3d at p. 206.

[23] *McKelley v. Turner* (1929) 96 Cal.App. 292, 293.

[24] *Id*. at pp. 293-294.

[25] *Ibid*.

[26] *McKelley v. Turner*, *supra*, 96 Cal.App. at p. 294.

supervisors. Pol.Code, § 995, subd. 4[27]; *Meeker v. Reed*, 70 Cal.App. 119, 123, 232 P. 760[28]; *People [ex rel. Webb] v. Marsh*, 30 Cal.App. 424, 427, 159 P. 191.[29] The mere manual transmission of the writing to the clerk, without authority and contrary to the express direction of the petitioner, was of no effect. The authority of an agent, not coupled with an interest, to do a particular thing, can be terminated by the principal at any time before the authorized act is performed. *McGorray v. Stockton Savings & Loan Society*, 131 Cal. 321, 63 P. 479. In this case the attorney was not authorized to file the petitioner's resignation until May 18th, and, prior to that time, his authority to file it was terminated.[30]

Applying *McKelley*, the facts here would support a conclusion that Khan terminated any authority the mayor may have had *before* the mayor delivered the document to the clerk—that is, before the resignation "could have become effective."[31] It is undisputed that Khan told the mayor by phone that Khan did not want to resign *before* the mayor transmitted the document to the clerk. Even though the statutory language has been revised since *McKelley* was decided, the substance remains largely the same, as does the logic of the court's conclusion.[32]

Based on all of the above, we conclude there are substantial issues of fact and law as to whether Khan resigned in the first instance within the meaning of section 1750(f).

### *Even If Khan Resigned, Was There an Effective Withdrawal of the Resignation?*

Even if it were determined that a lawful resignation satisfying section 1750(f) occurred, then issues of fact and law would arise as to whether Khan withdrew the

---

[27] See note 21, *ante* (reciting former Political Code section 995, subdivision 4).

[28] The cited case, *Meeker v. Reed* (1924) 70 Cal.App. 119, is discussed further below. As we explain in more detail below, the City seeks to rely on *Meeker v. Reed* to support its claim that Khan could not withdraw his resignation because it was effective immediately. (See notes 43-44, *infra*, and corresponding text in the body.) In short, *Meeker*—just like the *Marsh* case (which *McKelley* cites right after *Meeker*)—does not support that a resignation can be effective *before* its filing with the clerk. (See *ibid*; notes 21-22, *ante*, and corresponding text in the body.)

[29] See notes 21-22, *ante*, and corresponding text in the body.

[30] *McKelley v. Turner*, *supra*, 96 Cal.App. at pp. 294-295.

[31] *Id.* at p. 294.

[32] See Gov. Code, §§ 1750, subd. (f), 1770, subd. (c)(2); see also notes 21-22, *ante*, and corresponding text in the body.

11

resignation or instead whether a vacancy ensued under section 1770(c)(2). As stated above, a vacancy in the office of a councilmember arises "upon the delivery of a letter of resignation by the resigning council member to the city clerk."[33] We have already touched on issues pertinent to whether there was "delivery" here for purposes of the resignation statute. We now turn to the parties' arguments on whether there was an effective withdrawal of the resignation (assuming that there was a valid resignation) or whether instead a vacancy arose.

Khan argues primarily that no vacancy occurred because he withdrew the resignation before any purported delivery to the clerk by the mayor. He also points out that he followed up by sending emails to the city clerk and city manager, stating that he neither resigned nor authorized any statement to that effect.

Khan elaborates that the circumstances should be viewed as a contractual matter and that, as such, he withdrew his offer to resign before "acceptance" by the clerk or the City Council.[34] As support for his claim that a resignation is a contractual matter, Khan relies on cases involving resignations by employees governed by the Education Code.[35]

The City disputes Khan's claim that councilmember resignations are contractual, and asserts that resignations by officials do not require "acceptance."[36] The City argues further (and again) that Khan's resignation could not be withdrawn because his resignation stated that it was "effective immediately." In more detail, the City claims that his resignation was "effective immediately" *upon signing*—and thus not subject to withdrawal—with the resulting vacancy becoming effective *upon delivery* of the resignation to the clerk. To support its view that the resignation was effective immediately upon signing (and thus could not be withdrawn), and that only the vacancy became effective upon delivery, the City points out that the Legislature amended the vacancy statute such that a resignation does not necessarily occur upon delivery. As we

---

[33] Gov. Code, § 1770, subd. (c)(2); see also *id.*, § 1750, subd. (f) (councilmember's resignation must be in writing and made to the clerk); see notes 21-22, *ante*, and corresponding text in the body.

[34] Cf. *T. M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 278 (reciting "well-established principle of contract law" that offer may be revoked "any time prior to acceptance").

[35] See *Leithliter v. Board of Trustees*, *supra*, 12 Cal.App.3d at p. 1099 ("Resignations are contractual in nature"); *Sherman v. Board of Trustees* (1935) 9 Cal.App.2d 262, 266 ("[R]esignation is in the nature of a notice of the termination of a contract").

[36] *People v. Porter* (1856) 6 Cal. 26, 28.

explain, however, it does not appear that the vacancy statute amendment supports the City's argument.

First, the vacancy statute amendment was intended to create a legal fiction to allow a resignation to take effect on a specified date *after* the vacancy, so that a resigning member may constructively remain in office to vote on the appointment of a successor.[37] The purported events here—resignation occurs *before* vacancy—are in reverse order from those envisioned by the amendment (resignation occurs *after* vacancy). So the intended purpose of the amendment—to enable the resigning official to vote on a successor—could in no way be effectuated here. Second, the vacancy statute amendment did not purport to change the threshold requirements for an effective resignation (i.e., that it be in writing and made to the clerk) such that a resignation could take effect, with no ability to withdraw it, before those requirements had been met.

As further support for its argument that Khan could not withdraw his purportedly immediate resignation, the City seeks to distinguish the principles set forth in *Armistead v. State Personnel Board*. In that case, the California Supreme Court held that "unless valid enactments provide otherwise, an employee is entitled to withdraw a resignation if she or he does so (1) before its effective date, (2) before it has been accepted, and (3) before the appointing power acts in reliance on the resignation."[38] Although *Armistead* arose in the context of a public employee's resignation, the City acknowledges that a prior Attorney General opinion applied *Armistead* to a public officer's resignation.[39]

The City first asserts that because *Armistead* dealt with a resignation that was effective on a future date, its principles do not apply here to Khan's "effective immediately" resignation. In other words, the City asserts that Khan's attempted withdrawal failed because his resignation was "effective immediately," and thus not capable of being withdrawn before the "effective date" mentioned in the first *Armistead* factor. But again, even a resignation that purports to be "effective immediately" would only become effective once the resignation met all conditions of the resignation statute, and the City does not explain how the resignation would have met those conditions. As

---

[37] See Gov. Code, § 1770, subd. (c)(2) ("The letter of resignation may specify a date on which the resignation will become effective"); Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1795 (2013-2014 Reg. Sess.) as amended August 21, 2014, pp. 1-4 (discussing intent to enable councilmembers to make vacancy occur first so they can remain in office long enough to vote on their successor).

[38] *Armistead v. State Personnel Board*, *supra*, 22 Cal.3d at p. 206; see also *id*. at p. 201.

[39] See 64 Ops.Cal.Atty.Gen. 1, 2 (1981) (quoting *Armistead* and stating that resigning county supervisor had made no effort to withdraw resignation).

13

discussed above, the resignation does not appear to have been made to the clerk at the time Khan told the mayor by phone that Khan did not want to resign.[40]

Relevant to the second factor of the *Armistead* test, Khan argues that he withdrew any purported resignation when he spoke by phone to the mayor, and thus before the clerk or City Council "accepted" it. And again, the City disputes that "acceptance" has any relevance to public officer resignations. While we acknowledge that neither the resignation statute nor the vacancy statute expressly require "acceptance," withdrawal would appear to be allowed under either statute at least up until the time a would-be resignation is presented to the city clerk.

As to the third factor in *Armistead*, the City argues it was too late for Khan to withdraw when he spoke to the mayor within 15 minutes of their meeting because the City had already acted in reliance on the resignation. But *Armistead* specifies that any such reliance must cause "prejudice."[41] The City alleges that it relayed information on Khan's resignation to the media and filmed a statement from the mayor to be posted on Facebook in reliance on Khan's purported resignation. But it does not explain how those actions, even if potentially causing some inconvenience or embarrassment if the announced resignation did not occur, would have resulted in any actual prejudice to the City.[42] The City also alleges that it had begun taking unspecified steps in the process towards filling the seat—but agrees no vacancy had yet arisen when Khan spoke to the mayor because Khan's purported resignation had not been delivered to the clerk at that point. As such, there would have been no vacant seat to fill.

As still further support that Khan could not withdraw his resignation and prevent its delivery, the City relies on the Court of Appeal decision in *Meeker v. Reed*, which states that "it appears to be the settled law of this state that a resignation takes effect immediately upon the date mentioned in the written resignation, filed as provided by law

---

[40] See Gov. Code, 1750, subd. (f); notes 21-22, *ante* and corresponding text.

[41] See *Armistead v. State Personnel Board, supra*, 22 Cal.3d at pp. 201 (seeing no reason to deny employee right to withdraw resignation submitted by that employee "assuming that . . . the appointing power has not been prejudiced by any reliance on his letter or other form of notice"), 206 ("Absent prejudice, why should an employer be entitled to refuse a withdrawal submitted before the effective date stated in the resignation?").

[42] The mayor attests that, after leaving Khan, "I immediately advised the City's public information officer who was still outside that Mr. Khan had resigned and showed her the written resignation. The public information officer then told me that news crews were returning to the jail and requesting an interview with me regarding my conversation with Mr. Khan and his resignation."

by the officer tendering his resignation."[43] The quoted language from *Meeker*, however, appears to cut against the City's view, given that Khan's purported resignation document had not yet been provided to the clerk[44] when Khan told the mayor he did not want to resign.[45]

Based on all of the above, we conclude that substantial issues of fact and law warranting judicial resolution exist as to whether the document signed by Kahn constitutes a valid and effective resignation and meets the requirements of section 1750(f) in the first instance. We further conclude that, if it were determined that such a resignation occurred, substantial issues of fact and law would exist as to whether Khan effectively withdrew that resignation or whether a vacancy ensued. If there was no valid resignation under section 1750(f)—or if there was one but Khan effectively withdrew it such that there was ultimately no vacancy under section 1770(c)(2)—there would have been no seat for the City Council to fill, or for Yepez to assume.

## 3. The Public Interest Favors Authorizing Suit

Finally, we conclude that it is in the public interest to have this matter conclusively resolved through the prescribed legal process of quo warranto. We generally view the need for judicial resolution of a substantial question of fact or law as a sufficient "public purpose" to warrant granting leave to sue, absent countervailing circumstances such as pending litigation or shortness of time remaining in the term of office.[46] Here, judicial resolution of the issues raised by the application would help to ensure that councilmember resignations and vacancies occur lawfully, and we see no countervailing circumstances that would justify denying leave to sue.

The City disagrees and asserts that there are such countervailing circumstances. First, it argues that judicial proceedings could not be completed before the term of office

---

[43] *Meeker v. Reed*, *supra*, 70 Cal.App. at p. 123.

[44] See notes 21-22 *ante*, and corresponding text in the body.

[45] Khan also argues that because section 1770(c)(2) refers to "delivery of a letter of resignation by the resigning council member to the city clerk," the vacancy statute does not allow for delivery by someone else, such as the mayor. As the City recognizes, however, it is not clear that "resigning council member" refers beyond the immediately preceding noun "letter of resignation" and reaches "delivery" as well, to require delivery by the resigning officer. Also weighing against Khan's interpretation is that it could render absurd (or at least impractical) results, because an officer who wants to resign because of an illness or other incapacitating condition might not be able to personally deliver the letter of resignation.

[46] 98 Ops.Cal.Atty.Gen. 94, 101 (2015); 95 Ops.Cal.Atty.Gen. 77, 87 (2012).

15

at issue ends in November 2024, particularly in light of complications from the ongoing criminal proceedings against Khan. We disagree that judicial proceedings could not be completed within the remaining time (approximately one full year), and we do not foresee complications from the criminal proceedings because they address issues wholly distinct from whether Khan resigned and a vacancy ensued.

The City next argues that alleged misrepresentations by Khan in his quo warranto application should disqualify him from bringing a quo warranto lawsuit. For example, the City claims that Khan failed to state the correct date of arrest; failed to include the body camera evidence; failed to include a *certified* transcript of the video; and failed to mention that the purported resignation stated it was "effective immediately." The City also accuses Khan of making those words illegible in his exhibit attaching a copy of the signed document.

We disagree. First, Khan and the City have recited the same date of arrest, February 16, 2023.[47] Second, the City has not pointed to any inaccuracies in Khan's uncertified transcript, and the City has submitted a certified copy (as well as the video evidence) so we have that evidence and have reviewed it. The City also argues that the video is inconsistent with Khan's claim that the mayor asked him repeatedly to sign and that Khan stated he would talk to his lawyer. But both the video and the transcript show that the mayor continued to encourage Khan to resign after Khan had stated he would talk to his attorney. We are therefore unmoved by the claim that Khan's summary of events constitutes a disqualifying misrepresentation. Lastly, our copy of Khan's exhibit of the signed document shows that the words "effective immediately" are clearly legible.

The City alleges that Khan has made additional false statements that should disqualify him. For example, the City alleges that Khan misrepresented that the City has excluded him from participating in meetings as a councilmember. The City maintains that Khan did not ask to sit with the Council at a March 7, 2023 special meeting at which the Council discussed steps for filling the vacancy. But it is undisputed that the city attorney had already informed Khan's attorney that the Council believed Khan had resigned and would be filling his seat, resulting in Yepez's appointment on March 29, 2023. In light of these events, we cannot agree that Khan's attendance *as a member of the audience* makes it inaccurate for Khan to say that the City excluded him from participating in meetings *as a councilmember*.

The City also takes issue with Khan's attestation, made in his supporting declaration, accusing the mayor of working with investigators on the election fraud criminal case against him. The mayor denies working with the investigators in his own declaration, and the City argues that Khan's accusation is based on speculation and

---

[47] One typo referring to February 15 is the sole exception in all of Khan's application.

cannot support a quo warranto application. No part of this accusation, however, has played any role in our consideration of this matter.

For the reasons discussed above, we conclude that allowing the proposed quo warranto action to proceed would serve the public interest. Accordingly, the application for leave to sue in quo warranto is GRANTED.